UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADFORD ROSS,

        Plaintiff,

v.

Case No. 1:15-cv-218

Hon. Robert J. Jonker

VICTOR L. DOMINGUEZ-BEM
and CORIZON, INC.,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a state prisoner at a Michigan Department of Corrections (MDOC) facility pursuant to 42 U.S.C. § 1983. Plaintiff's claim involves defendants' alleged failure to treat a cervical injury with, among other things, a neck collar, physical therapy and work restrictions. This matter is now before the Court on defendants' motion for summary judgment (docket no. 44).

    **I.**    **Plaintiff's claims**

The defendants in this case are Victor L. Dominguez-Bem, M.D. (sometimes referred to as "Dr. Dominguez-Bem" or "defendant doctor") and Corizon Health, Inc. (sometimes referred to as "Corizon"). Plaintiff has alleged the following facts in support of his claim.

On or about March 24, 2014, Corizon approved a neurology consultation for plaintiff at the request of Dr. Dominguez-Bem. Compl. (docket no. 1, PageID.8). On April 24, 2014, Dr. Harish Rawal (sometimes referred to as "the neurosurgeon") performed the following procedures on plaintiff: cervical discectomy and fusion at C5-C6; C5-C6 cage reconstruction; C5-C6 anterior

plate instrumentation; harvesting of sternal bone graft; and use and interpretation of fluoroscopy during the procedure. Dr. Rawal's Operative Report (April 24, 2014) (docket no. 46-1, PageID.410).[1]

The gist of plaintiff's complaint is that defendants failed to follow Dr. Rawal's post-operative instructions. The first list of instructions appear in the April 24, 2014 Transfer Summary from Dr. Rawal to the MDOC's Duane Waters Hospital (DWH):

1. He should wear the cervical collar all the time. He can take a shower after 3 days and at that time the collar should be removed, but he should not bend his neck down.

2. Pain medications as required should be provided initially. He may require narcotics for the next 2 to 3 days. We do not recommend anti-inflammatory agents on this patient for a period of 6 months.

3. He should not be on the upper bunk. He should not lift above his shoulder.

4. He may need throat lozenges; Cepacol is recommended.

5. I would like to see him after 6 weeks with cervical spine x-rays, AP and lateral.

6. It may be advisable for him to use the handicapped line for the first 2 weeks.

Transfer Summary (docket no. 46-1, PageID.412).

Plaintiff arrived at DWH on April 25, 2014. Compl. at PageID.8. While at DWH, plaintiff received an evaluation and authorization for some physical therapy. *See* Physical Therapy Evaluation (April 29, 2014) (PageID.276) and Authorization (April 30, 2014) (PageID.277). After spending some days rehabilitating at DWH, plaintiff was transferred to Lakeland Correctional Facility (LCF) on May 5, 2014. Compl. at PageID.8. Upon his transfer, DWH provided LCF was

---

[1] Most of plaintiff's medical records appear in docket no. 46-1, PageID.265-428. The Court will identify records in this docket entry by title, date if applicable, and "Page.ID.xxx".

2

provided with the neurosurgeon's post-operative instructions. *Id*. The instructions from DWH's inpatient progress notes include:

> a.  Post-operative care: Leave C-collar on at all times until further instructions., [sic] Shower after 3 days (on 4/28/2014). Do not flex neck. Do not lift arms over shoulder. Fall risk precautions.

DWH Inpatient progress notes (May 5, 2014) (PageID.358). The notes stated that plaintiff was ambulatory and eating a regular diet, and included the following entry in the "Discharge plan":

> Activity: As tolerated, C-collar on at all times, [d]o not flex neck. Do not lift arms over shoulder. Fall risk precautions until further instructions after visit [sic] Dr. Rawal.

*Id*.

Plaintiff alleged that on May 7, 2014, Dr. Dominguez-Bem disregarded the neurosurgeon's orders that plaintiff wear the cervical collar for a minimum period of five weeks and ordered him to throw the cervical collar in a trash can. Compl. at PageID.8. Dr. Dominguez-Bem also told plaintiff that he was just going to have to suffer with pain "because he [the doctor] was not going to give him [plaintiff] anything other than Tylenol." *Id*. at PageID.9. Plaintiff filed a grievance that day regarding Dr. Dominguez-Bem's actions. *Id*. at PageID.10. Plaintiff was mentally distraught and sought out the services of psychologist Ms. Burch, who looked on the computer and verified that Dr. Dominguez-Bem had cancelled the cervical collar, pain medications and muscle relaxers. *Id*. at PageID.9. A few days later, on May 13, 2014, plaintiff was placed on a five-day a week work assignment as a unit porter contrary to the neurosurgeon's orders. *Id*. at PageID.9-10.

3

Plaintiff had an interview for his grievance on May 19, 2014.[2] The head nurse (R. Rider) stopped the interview and told plaintiff that he should be wearing a cervical collar at all times. *Id*. at PageID.10. Nurse Rider found plaintiff a cervical collar, placed it on him, and "made several apology's [sic] for defendant Dominguez-Bem taking away the cervical collar." *Id*. Nurse Rider completed a durable medical equipment contract with plaintiff for a cervical collar that day and had Dr. Dominguez-Bem complete a medical detail for the cervical collar which the doctor had erroneously taken on May 7, 2014. *Id*. Plaintiff did not make any allegations regarding his condition or treatment until July 4, 2014, when Nurse Earl completed a medical detail to extend the use of the cervical collar for another month. *Id*. Then, plaintiff alleged that on August 8, 2014, LCF Healthcare took plaintiff's cervical collar "without the [surgeon's] orders." *Id*. Plaintiff did not allege who took the collar and the basis for that action.

In this regard, the chronology of events set forth in plaintiff's complaint do not refer to his subsequent followup appointments with Dr. Rawal in June and August 2014. Plaintiff's medical records indicate that he had a follow up examination with Dr. Rawal on June 20, 2014. Dr. Rawal's consultation notes state in pertinent part:

> [Plaintiff] is [sic] restricted movement of the neck. He is wearing cervical collar. [H]e told me that for his first 2 to 3 weeks, he was not allowed to wear the collar.
>
> Strength in upper extremities normal. There is no arm radiculopathy. There are no signs of myelopathy.
>
> Cervical spine x-ray shows stable hardware.
>
> I have told him that he can take the collar [sic] when he is not active, but I still want him to wear it until I see him the next time, which will be in 6 weeks, when

---

[2] Plaintiff sometimes alleged that the interview occurred on May 29, 2014. *See* Compl. at PageID.10.

>he is moving around. I have also started him on an exercise program to move his neck from side to side, so some relaxation of the muscle occurs, which would reduce his neck pain. He understands that.

Dr. Rawal Outpatient Consultation (June 20, 2014) (PageID.420). Plaintiff's medical records also include an appointment with the neurosurgeon on August 29, 2014, at which time Dr. Rawal recommended that plaintiff perform neck exercises with no followup needed. *See* Clinical Progress Note (PageID.394); Nurse Protocol (Aug. 29, 2014) (PageID.312).

Plaintiff goes on to allege that between May 6, 2014 and February 18, 2015 he filed over 35 requests regarding his unbearable neck pain. Compl. at PageID.10. After five or six months of filing grievances, plaintiff was changed to a new medical provider, P.A. Olette [sic], who requested pain medication from Corizon's pain committee. *Id*. at PageID.10-11. However, Corizon acted with deliberate indifference to plaintiff's serious medical needs by denying the request. *Id*. at PageID.11.

Plaintiff alleged that on January 16, 2015, eight months after the neurosurgeon's post-operative orders, Corizon "finally" approved physical therapy for his neck. *Id*. At that time, the physical therapist, Scott Weaver, stated that plaintiff should have had physical therapy in June and July 2014, and that plaintiff's neck muscles have "froz[e]n up" due the unnecessary delay in treatment. *Id*. While plaintiff appears to allege that defendants violated the neurosurgeon's order for physical therapy, the Court notes that the neurosurgeon's post-operative instructions and folloup reports, *supra*, did not include an order or recommendation for physical therapy in June or July, 2014. The only previous authorization for physical therapy was while plaintiff was recuperating at DWH in April 2014. *See* Physical Therapy Evaluation at PageID.276; Physical Therapy Authorization at PageID.277.

5

Plaintiff alleged that as a result of defendants' conduct in failing to follow the neurosurgeon's orders, he suffers from daily severe pain in the neck area, the damage to his neck may never be relieved, and the pain and damage affect all of plaintiff's daily activities. Compl. at PageID.11. For his relief, plaintiff wants an injunction ordering Corizon "to do all [necessary] treatment to relieve pain and to correct any and all issues with [my] neck," $380,000.00 in compensatory damages from each defendant and $250,000.00 in punitive damages from each defendant, for total monetary damages in the amount of $1,260,000.00. *Id.* at PageID.12.

### II. Defendants' motion for summary judgment

#### A. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations

> (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, plaintiff's claims arise under the Eighth Amendment. It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim

consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### B. Summary of plaintiff's treatment

Dr. Dominguez-Bem submitted a declaration which summarized the medical treatment provided to plaintiff. Relevant portions of the declaration and citations to plaintiff's medical record are set forth below.

> On April 28, 2014, we received a fax from Allegiance Health outlining the procedure performed and providing the discharge instructions. The discharge instructions were to follow up with Dr. Rawal in six weeks and to take x-rays of cervical spine in six weeks. In this fax, there were no instructions as to how long Plaintiff was supposed to wear the cervical collar.

Dominguez-Bem Decl. (docket no. 44-1, PageID.236). The doctor further stated that:

> On May 5, 2014, Plaintiff was discharged from DWH and was sent back to Lakeland Correctional Facility. Plaintiff's discharge instructions stated that he should keep the cervical collar on as tolerated.

*Id.* at PageID.237, citing DWH Inpatient progress note (May 5, 2014).

Dr. Dominguez-Bem summarized his post-operative examination of plaintiff as follows:

> 16. I saw Plaintiff on May 7, 2014. I noted that Plaintiff was using medication and that his status had improved. He reported pain at the incision site. Plaintiff could move fine without any assistance. I ordered pain medication for Plaintiff, along with medication for GERO, high cholesterol, and hypertension. Based on my physical examination of Plaintiff, and a review of his chart, including the physical therapy evaluation, I determined that he did not need the cervical collar. It is important for a patient who is recovering from this surgery not to wear the cervical collar for too long. Wearing a cervical collar for too long can result in the neck stiffening up, atrophy of the muscles, loss of coordination, contraction of soft tissue, and psychological dependence (i.e., the patient feels like he needs the collar even though there is [n]o physical need for it.) While each case is different, I believe that a patient with a one or two level discectomy should wear a cervical collar for about a week or two. In light of Plaintiff's encouraging healing process, based on my knowledge, training, and experience, I determined that he should no longer wear the cervical collar.
>
> 17. At my meeting with Plaintiff, he smelled strongly of alcohol, which was concerning to me. Alcohol is prohibited in prison. As such, an inmate who consumes alcohol is either drinking smuggled alcohol or is drinking alcohol that has been concocted in prison. Homemade alcohol is very dangerous; there have been multiple outbreaks of

9

> botulism in prison populations caused by inmates drinking prison wine.
>
> 18. On May 15, 2014, Plaintiff complained of neck instability and pain. He asked the nurse if he should be wearing the cervical collar. Based on Plaintiff's complaints and his requests, P.A. Ouellette and Nurse Rider reissued the cervical collar to Plaintiff on May 19, 2014, with the hopes of reducing pain and stabilizing his neck. Plaintiff was seen on June 4, 2014. His status improved, although he still reported pain in the neck and chest. Nurse Rider discussed Plaintiff's alcohol intoxication at his last appointment. Nurse Rider explained that certain pain medications could not be provided to Plaintiff since they were contraindicated with alcohol. Nurse Rider reviewed and ordered medications for Plaintiff.

*Id*. at PageID.237 citing: Medical Notes (May 7, 2014) (noting that plaintiff was drowsy with impaired balance "with strong etoh [sic] smell"; Ethanol blood test ordered) (PageID.371-372); Annual Nurse Well Encounter (May 13, 2014) (PageID.283); Nurse Well Encounter (May 15, 2014) (noting "Chart to PA with prisoner concern 'should I still be wearing soft collar?'") (PageID.282); Clinical Progress Note (May 19, 2014) ("Soft Cervical Collar issued to prisoner as instructed/MSP. Instructed to wear at all times unless showering until after his recheck visit with neuro-surgery.") (PageID.370); Durable Medical Equipment Contract for 1 soft cervical collar (May 19, 2014) (PageID.428); and, Chronic Care Visit (May 21, 2014) (PageID.373-375).

As discussed, plaintiff had a follow up examination with Dr. Rawal on June 20, 2014, at which time the neurosurgeon stated "I still want him to wear [the cervical collar] until I see him the next time, which will be in 6 weeks, when he is moving around" and that plaintiff has been started "on an exercise program to move his neck from side to side, so some relaxation of the muscle occurs, which would reduce his neck pain." Dr. Rawal Outpatient Consultation (June 20, 2014) (PageID.420).

Dr. Dominguez-Bem notes that a few days later, on June 25, 2014, plaintiff refused his chronic care appointment, and that while plaintiff complained of neck pain on June 29, 2014, he refused to see the doctor. Dominguez-Bem Decl. at PageID. 239 citing: Kite Response (June 29, 2014) (scheduling nurse sick call after noting that plaintiff has neck pain and "refuses to see Dr. D.") (PageID.294); MDOC Release from responsibility for medical, surgical, psychiatric and other treatment (June 25, 2014) (plaintiff declined recommended treatment for followup care giving no reason for his refusal) (PageID.427).

On July 2, 2014, plaintiff complained of neck pain but stated that he did not want to see Dr. Dominguez-Bem because he had a lawsuit against the doctor. *Id*. at PageID.239 citing: Kite Response (July 2, 2014) ("Prisoner states he is having post surgical neck pain and does not want to see his MP [medical provider] because he has litigation against him and fears retaliation") (PageID.295); Administrative Progress Noted (July 2, 2014) ("Review of follow up consult with Dr. Rawal revealed that the doctor recommended neck exercises. No pain medication was recommended. Pisoner [sic] was scheduled to see MP 6/25/14. Prisoner refused. Will reschedule for next week.") (PageID.380); Kite Response (July 14, 2014) (plaintiff stated "I need to see MSP [medical service provider] for severe neck pain. I will not see Dr. Dominguez. I have an on going grievance and a civil law suit against him. I feel threathed [sic] in a room alone with him. Please make arrange for me to see other doctor.") (PageID.298); and, Kite Response (July 16, 2014) (prisoner stated that "[p]ain in neck and back unborable [sic]. Please list w/any MSP [medical service provider] other than Dr. Dominguez. I have a conflict w/him. Please help."; plaintiff advised that he is scheduled to see a MP very soon and that "he cannot choose which MP he sees")

(PageID.296). While plaintiff filed a grievance against Dr. Dominguez-Bem in May 2014, there is no evidence that he had a civil lawsuit pending against the doctor as claimed in the July 2014 kite.[3]

Nevertheless, plaintiff finally agreed to see Dr. Dominguez-Bem on July 17, 2014. The doctor discussed plaintiff's pain with him, including the fact that his actions made it worse. The doctor ordered pain medication, a neurosurgery evaluation, and x-rays. Dominguez-Bem Decl. at PageID.240. X-rays from August 1, 2014 showed no abnormality or disease. *Id*. On August 5, 2014, plaintiff complained of head and neck pain from his bunkmate accidentally stepping on his neck when he was getting out of bed. The doctor ordered another round of x-rays to rule out serious injury. The x-rays showed mild degenerative changes, but no other problems. Dominguez-Bem Dec. at PageID.240.

As discussed, plaintiff was seen by the neurosurgeon on August 29, 2014 who recommended neck exercises and required no further followup appointments. Clinical Progress Note (PageID.394). Dr. Dominguez-Bem noted that plaintiff complained of pain in September and October, 2014, was seen by LCF medical personnel, and prescribed Ibuprofen. *Id*. On October 31, 2014, P.A Ouellette submitted plaintiff's request to be evaluated by the pain management committee. *Id*. While the request was pending, plaintiff sustained a "boxer's fracture" to his hand, which was purportedly caused when he fell from a transportation van while shackled, but questioned by health care providers as a self-inflicted injury. Plaintiff's health care provider's request for Ultram, a

---

[3] The Court notes that plaintiff did not file the present action until February 27, 2015. While plaintiff filed four previous lawsuits in this district, none of these previous unsuccessful lawsuits named Dr. Dominguez-Bem as a defendant. *See Ross v. MDOC et al.,* 2:03-cv-1; *Ross v. Quinlin et al.*, 1:03-cv-650; *Ross v. Duby et al.*, 1:09-cv-531; and, *Ross v. Duby et al.*, 1:10-cv-1083. In addition, all of these cases were closed prior to the incidents alleged in this action. Finally, the Court has found no record of a lawsuit filed against the doctor in the Eastern District.

narcotic pain medication, was approved on December 4, 2014. *Id*. citing: Nurse Protocol (Dec. 2, 2014) (PageID.320); ACMO Review (Dec. 4, 2014) (PageID.289).

Due to plaintiff's continued report of pain and lack of range of motion, his health care providers requested that he be evaluated for physical therapy, with therapy approved on December 8, 2014. Dominguez-Bem Decl. at PageID.240. *See* Consultation (PageID.287). Plaintiff had another x-ray on December 12, 2014, which showed a stable fusion and no evidence of fracture or abnormality. Dominguez-Bey Decl. at PageID.241. On December 15, 2014, plaintiff reported that he was not taking his restricted (narcotic) medications and requested to be removed from the medicine call out lines. Kite Response (Dec. 15, 2014) (PageID.301). Plaintiff reported stiffness in his neck on December 26, 2014. Plaintiff was put on Zantac to protect his stomach from continued Motrin use. Dominguez-Bey Decl. at PageID.241.

Dr. Dominguez summarized plaintiff's physical therapy as follows:

35. Plaintiff was evaluated for physical therapy on January 15, 2015. The therapist believed that physical therapy could help with Plaintiff's neck tightness. The request for physical therapy was approved. Plaintiff complained that the neck exercises did more damage than good. Plaintiff complained of neck pain that was 4 out of 10 in intensity. Nurse Haase noted her belief that the pain was due to limited movement after surgery. Again, this is a risk of overuse of a cervical collar.

36. Plaintiff attended several sessions of physical therapy He complained that the treatment was making his pain worse. He asked to be taken off of wheelchair pushing duty; this request was granted. When he was seen on February 4, 2015, he reported that naproxen was working better than motrin. He was told that he had to move his neck and to not keep it in the same position all the time.

Dominguez-Bem Decl. at PageID.241 citing: Physical Therapy Assessment (Jan. 15, 2015) (PageID.336-337); MDOC Consultation (Jan. 16, 2015) (request for outpatient physical therapy)

13

(PageID.280-281); Kite Response (Jan. 23, 2015) (advising plaintiff that physical therapy approved on Jan. 16th) (PageID.302); Nurse Protocol (Jan. 26, 2015) (plaintiff has difficulty moving neck, advised that physical therapy starts tomorrow) (PageID.322-323); Physical Therapy (Jan. 27, 2015) (plaintiff tolerated physical therapy well on this date) (PageID.338); Physical Therapy (Jan. 29, 2015) (plaintiff tolerated treatment fait with some limitations still present in neck flexibility; plaintiff stated that he has noticed increased movement before pain starts) (PageID.339); Nurse Protocol (Jan. 29, 2015) (plaintiff returned from physical therapy; offers no complaints); (PageID.324); (Kite Response (Feb. 1, 2015) (plaintiff stated that neck pain getting worse with every physical therapy session) (PageID.303); Kite Response (upcoming appointment scheduled in response to plaintiff's request to be removed from wheelchair pusher duty) (Feb. 2, 2015) (PageID.304); Nurse Protocol (Feb. 3, 2015) (noting temporary restriction, no work assignment) (PageID.315); Physical Therapy (Feb. 3, 2015) (plaintiff tolerated physical therapy well on this date) (PageID.329-330); Physical Therapy (Feb. 5, 2015) (plaintiff agreeable to therapy and tolerated it well) (PageID.340); Nurse Protocol (Feb. 5, 2015) (plaintiff denies any new discomfort upon return from physical therapy at DWH, patient education provided) (PageID.316-317); Physical Therapy (Feb. 10, 2015) (plaintiff complaining of pain, 8/10 prior to therapy and 7/10 at end)(PageID.341); Physical Therapy (Feb. 12, 2015) (plaintiff tolerated therapy fair on this date) (PageID.342); Nurse Protocol (Feb. 12, 2015) (plaintiff has no complaints upon return from physical therapy) (PageID.325).

On February 17, 2015, plaintiff stated that he wanted to be discontinued from physical therapy. Physical Therapy Treatment (Feb. 17, 2015) (PageID.343). On that date, the physical therapist commented: that "[p]atient appears very agitated." *Id*. Plaintiff was told to continue

14

exercises learned in physical therapy. Nurse Protocol (Feb. 17, 2015) (PageID.326). Plaintiff signed his complaint in this lawsuit the next day. *See* Compl. at PageID.12.

### C. Dr. Dominguez-Bey

Plaintiff's primary claim is that Dr. Dominguez-Bem terminated plaintiff's use of the cervical collar contrary to Dr. Rawal's instruction to DWH that "[Plaintiff] should wear the cervical collar all the time. He can take a shower after 3 days and at that time the collar should be removed, but he should not bend his neck down." *See* Plaintiff's Response (docket no. 50, PageID.434); Transfer Summary at PageID.412. The question before the Court is whether Dr. Dominguez-Bem's decision to terminate use of the cervical collar on May 7, 2014, violated plaintiff's Eighth Amendment rights.

It is undisputed that Dr. Dominquez-Bem discontinued the use of the cervical collar on May 7, 2014, that plaintiff complained about it to LCF medical staff, and that plaintiff received a cervical collar twelve days later on May 19, 2014. In his declaration, Dr. Dominguez-Bem set forth his reasoned medical judgment for discontinuing use of the collar, i.e., based on his physical examination of plaintiff, a review of his chart and the physical therapy evaluation, the doctor determined that plaintiff did not need the cervical collar as of May 7, 2014. On the other hand, Dr. Rawal's post-operative instructions stated that plaintiff "should wear the cervical collar all the time" and that the doctor "would like to see him after 6 weeks with cervical spine x-rays." At plaintiff's followup appointment with Dr. Rawal on June 20, 2014, the neurosurgeon appeared to resolve this confusion by stating that he wanted plaintiff to use the cervical collar until the next appointment in six weeks. While plaintiff alleged that LCF healthcare staff took his cervical collar on August 8, 2014, this was seven weeks after plaintiff's June 20th appointment with Dr. Rawal and would appear

consistent with the neurosurgeon's instructions. Furthermore, plaintiff does not allege that Dr. Dominguez-Bey ordered this action. At most, plaintiff's claim against Dr. Dominguez-Bem amounts to a disagreement between two physicians, Dr. Dominguez-Be, and the neurosurgeon, regarding plaintiff's use of the cervical collar.

A difference in medical opinion is not actionable under § 1983. *Lane v. Wexford Health Sources (Contreator)*, 510 Fed. Appx. 385, 388 (6th Cir. 2013), citing *Estelle*, 429 U.S. at 107. See *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference."). As the court observed in *Douglas v. Stanwick*, 93 F.Supp.2d 320 (W.D. N.Y. 2000):

> Not every physician will treat every ailment in exactly the same manner. That does not mean that one of the physicians must be acting with deliberate indifference to the patient's needs. That is particularly true when one of the physicians is more familiar with the jail or prison environment . . .

*Douglas*, 93 F.Supp.2d at 325 (listing cases). *See also, White v. Napoleon*, 897 F.2d 103, 110 (3rd Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir.1977) (where a prisoner's private physician recommended a course of treatment for the plaintiff's condition, a prison doctor's use of a different treatment regimen did not amount to deliberate indifference for purposes of an Eighth Amendment claim).

Furthermore, this is not a case involving the total absence of medical treatment. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004). As discussed, plaintiff was provided with extensive post-operative care by Dr. Dominguez-Bem and LCF healthcare staff.

Finally, plaintiff relies on an April 15, 2014 [sic] hearsay statement of Nurse Practitioner Wendy S. Liu at the Cotton Correctional facility that "the pain I am now [sic] and have been going through, is due to the fact that I did not have a cervical collar on for a critical period after surgery, as required by the surgeon." *See* Ross Decl. (April 22, 2016) (docket no. 50-1, PageID.445-446). Assuming that N.P. Liu had prepared an affidavit containing this statement, such a statement would not salvage plaintiff's claim against Dr. Dominguez-Bem. At most, N.P. Liu's statement might support a medical malpractice claim based upon the theory that Dr. Dominguez-Bem was negligent when he decided to discontinue the cervical collar on May 7, 2014 without consulting with Dr. Rawal. However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106 . For these reasons, Dr. Dominguez-Bem is entitled to summary judgment with respect to plaintiff's claims.

### D. Corizon

Plaintiff claims that Corizon was deliberately indifferent to his serious medical needs by denying his request for pain medication and failing to provide physical therapy until January 16, 2015, alleging (in his words):

15. From 05/06/2014 to date plaintiff Ross, has filed over thirty five seperate health care request all concerning unbarable neck pain he was in. See Exh. J. & K.

16. After approx. 5 or 6 months and grievance filling, plaintiff was changed to a different medical provider, P.A. Ms. Olette. P.A. Olette put in for pain medications with defendant Corizon's Inc. pain committy, and it was denied. Defendant Corizon has provided no reason for the denial of requested and required pain medications. This demonstrates defendant Corizon's deliberate indifference to plaintiff Ross' serious medical need. Defendat Corizon Health Inc. is lacking in a policy to prevent the deprevention of constitutional due prosses.

17. As of 01/16/2015 Corizon Health has fianally approved for physical theropy to start on plaintiff's neck, some eight months later. The physical theropist Scott Weaver states that plaintiff should have had theropy in June and July 2014. The theropist also states that the neck muscles have frozon up from the unnessary dealy in treatment. He states he does not know if theropy will help at this late date. Theropist Weaver stated he was not sure how much damage was done, as he is no neuro-sergeon. See Exh. M

Compl. at PageID.10-11 (emphasis in original).[4]

A plaintiff who sues a private or public corporation for constitutional violations under § 1983 must establish that a corporate policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996). Thus, in order to state a § 1983 claim against Corizon, plaintiff must allege the existence of a policy, practice or custom that both violated his Eighth Amendment rights and resulted in an injury. *See Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001) (a prisoner's § 1983 claim against a corporation providing medical services at a state

---

[4] With respect to Therapist Weaver's alleged statements, plaintiff relies on Exhibit "M", "Affidavit of Bradford C. Ross." The Court notes that this exhibit is not an affidavit. Rather, it is an unnotarized, handwritten document signed by plaintiff, which contains hearsay statements allegedly made by Therapist Weaver on or about January 20, 2014. *See* Exh. M (docket no. 1-4, PageID.64).

correctional facility must "be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights"); *Moreno v. Metropolitan General Hospital*, No. 99-5205, 2000 WL 353537 at *2 (6th Cir. March 28, 2000) (in order to state a § 1983 claim against PHS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury"). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986). *See Bartalone v. Berrien County*, 643 F. Supp. 574, 578-79 (W.D. Mich. 1986) (a plaintiff in a § 1983 action "must allege sufficient facts to establish the probable existence of the pattern, custom, or policy of which [he] complains.").

Plaintiff does not allege that Corizon engaged in a pattern, custom or policy that caused a deprivation of plaintiff's Eighth Amendment rights. Rather, plaintiff's only allegation is a vague claim that Corizon "is lacking in a policy to prevent the [deprivation] of constitutional due [process]." Plaintiff neither explains the nature of the alleged unconstitutional policy nor presents evidence of such a policy. Furthermore, as discussed, *supra*, plaintiff received specialized medical treatment requested by his medical providers at LCF, including neurosurgery, narcotic pain medication, and physical therapy. For these reasons, Corizon is entitled to summary judgment on plaintiff's claims.

### III. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (docket no. 44) be **GRANTED** and that this action be **TERMINATED**.

Dated: February 2, 2017    /s/ Ray Kent
RAY KENT
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).